# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 7, 2013 Session

## STATE OF TENNESSEE v. DON MAURICE TAYLOR

**Direct Appeal from the Circuit Court for Gibson County**
**No. 18226        Clayburn L. Peeples, Judge**

---

**No. W2012-02027-CCA-R3-CD  - Filed August 12, 2013**

---

The appellant, Don Maurice Taylor, pled guilty in the Gibson County Circuit Court to one count of second degree murder and two counts of aggravated assault.  After a sentencing hearing, the trial court sentenced him to concurrent sentences of twenty-five years for the murder conviction, a Class A felony, and six years for each aggravated robbery conviction, a Class C felony.  On appeal, the Petitioner contends that his effective twenty-five-year sentence is excessive because the trial court misapplied enhancement factors and failed to apply certain mitigating factors.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

C. Mark Donahoe, Jackson, Tennessee, for the appellant, Don Maurice Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; and Garry G. Brown, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that in September 2009, the appellant was charged with first degree premeditated murder and two counts of aggravated assault by causing serious bodily injury.  In September 2012, the appellant pled guilty to second degree murder as a lesser-

included offense of first degree murder and both counts of aggravated assault. Pursuant to the plea agreement, the trial court was to determine the length of the appellant's sentences.

At the appellant's sentencing hearing, Lori Word testified that the victim, Darnell Gentry, was a close friend of her mother, Gwendolyn Buchanan. Word had known the victim since she was young. Word also knew the appellant, who was a few years younger than Word, because they went to school together. On the day of the crimes, a Sunday, Word, Gentry, and several other people were at Buchanan's home to eat an evening meal. Word fixed her plate in the kitchen and went outside to sit on the front porch with everyone else. She said six people, including herself and the victim, were on the porch.

Word testified that while everyone was "talking and cutting up," the appellant approached the porch and told two people sitting on the porch steps to "excuse [him]" and that "he would like to get by." Word stated, "By that time . . . couldn't nobody move because we was right there, you know. We couldn't go no where." The appellant came onto the porch and said twice, "'I'm sorry, but y'all don't have anything to do with this.'" Word said that everyone was in shock and that no one had time to do anything because the appellant "come that quick." The appellant made eye contact with the victim and pulled out a gun. Word begged the appellant not to shoot the victim, and the victim told the appellant, "'Please don't kill me.'" The appellant fired his gun nine times, shooting the unarmed victim multiple times, and walked away. The victim fell back and began gasping for breath. During the shooting, nine "fragments" went into Word's legs. Additional fragments went into the arm of another woman who also had been sitting on the porch.

On cross-examination, Word testified that the appellant was calm. She acknowledged that he did not run onto the porch, that he did not point the gun at anyone other than the victim, and that he did not run away after the shooting. Word said she had heard that the victim had threatened the appellant on the Friday prior to the shooting. She acknowledged that during the threat, the victim told the appellant that the victim "would do what he did to [the appellant's] daddy." Word also acknowledged that the victim had killed the appellant's father twenty-five or thirty years ago.

On redirect examination, Word testified that she had talked with the victim about his threatening the appellant. The victim explained to Word that on the day of the threat, he was in a store. The appellant came into the store, saw the victim standing in line, and "pointed him out." The victim told the appellant, "'All right, you keep on picking with me I'm gonna do you like I did your daddy.'" Word saw the victim after the incident, and the victim was upset. She asked him what was wrong, and he told her, "'That boy picked on me. . . . That's why I stopped coming down here.'" Word said that about two months before the shooting, the victim had stopped visiting her mother's house because he had seen the appellant walking

"back and forth, up and down." The victim told Word that he wanted to talk with the appellant one day but that "'with everybody else telling [the appellant] this and that [the appellant] would never understand." The victim was trying to avoid the appellant and told Word, "I served my time for it. . . . I want to let it go and just leave it alone."

Charles Gentry, the victim's brother, testified that he had been "trying to wrap [his] head around all of this." Addressing the appellant, Mr. Gentry said that he loved the victim "with all [his] heart and soul" and that "nobody deserves to be shot that many times." He said that the victim's death had hurt his family and that the appellant was "misdirected" and "misinformed" about the victim.

On cross-examination, Mr. Gentry acknowledged that the victim served about ten years in prison for killing the appellant's father before the victim was paroled. Mr. Gentry said he was unaware that the victim had returned to prison for "another problem" and was paroled a second time.

Tonya Gentry, the victim's younger sister, testified that at the time of the victim's death, she was in a movie theater. When she left the theater, she checked her cellular telephone and discovered that her family had been trying to call her. Ms. Gentry learned that the victim had been shot and went to the hospital. The victim had been shot nine times, five times in the head. Ms. Gentry said that she passed out at the hospital and that the victim's death was hard to accept. She said that her family and the appellant's family had grown up together and that "[t]his was all over a woman . . . , my brother's wife." Ms. Gentry explained that the victim's wife had used the appellant's father to make the victim jealous and that the victim had killed the appellant's father. She said the victim "wasn't in no trouble 'til this happened with him and [the appellant's father]." Ms. Gentry stated that the appellant's children were going to grow up without a father and that "it didn't have to happen."

On cross-examination, Ms. Gentry acknowledged that the victim shot the appellant's father with a shotgun when the appellant was about ten years old. She also acknowledged that prior to killing the appellant's father, the victim served time in confinement for aggravated assault.

Kim Benard, the appellant's mother, testified for him that the appellant was born in 1979. One day when the appellant was ten years old, Benard came home, and her children told her that the victim had shot their father in the head. She said the casket for the appellant's father was closed because the victim "blew [his] head off." The appellant was a good child but missed his father, and Benard "couldn't take [his] daddy's place." After the appellant started middle school, he got into a couple of fights. Bernard said that she talked

with the appellant and that he changed. One day about six years before the sentencing hearing, the appellant came home and told Benard that a man in the unemployment office had told the appellant about the victim's shooting the appellant's father. The appellant told his mother that he was hurt, and the appellant cried. Benard acknowledged that the appellant had worked for most of his life and that he worked temporary jobs when he could not find steady employment.

Christine Anderson, the appellant's sister, testified that the appellant was "a pretty quiet person growing up" and that he always kept his feelings to himself. However, his violence toward the victim was outside of his character, and the trial court did not need to be concerned that the appellant would commit another crime after his release from prison. She said she hoped that the appellant's children would not have to grow up without him.

Joseph Angelillo, a clinical psychologist, testified that twenty percent of his practice involved forensic psychology and that eighty percent involved standard psychotherapy. Dr. Angelillo conducted six interviews with the appellant totaling about eight hours and had a one-hour telephone interview with two members of the appellant's family. Dr. Angelillo also gave the appellant an I.Q. test, a screening for possible brain damage, four psychological tests, and two tests to detect malingering. When Dr. Angelillo met with the appellant, the appellant was taking Haldol, a drug used to treat psychotic symptoms or as an adjunct in the treatment of depression; the antidepressant Lexapro; and Cogentin, a drug used to treat the side effects of Haldol. Dr. Angelillo concluded that the appellant understood right from wrong, that he was angry, and that he had low self esteem. Dr. Angelillo said that the appellant did not express remorse for killing the victim but that the appellant had a difficult time remembering the crime, which was not unusual. The appellant tried to kill himself at least one time while he was in confinement for this case and did not appear to be malingering. Dr. Angelillo said that the appellant was "incredibly simplistic, black and white in thinking" and that the appellant's "perception of reality was quite skewed or askew at the time."

Dr. Angelillo testified that the appellant's I.Q. was seventy-four, "meaning if Don was compared to others in approximately his age range he would be higher than four percent, lower than 95.99 percent." However, Dr. Angelillo thought the appellant's medication "probably dulled his performance" on the I.Q. test. Based upon the appellant's being a high school graduate and able to hold a job prior to the crimes, Dr. Angelillo thought the appellant could learn and hold a job in the future. He stated, "It's more the emotional issues that need to be improved, worked upon." He said he thought the appellant suffered from a mental disorder that caused a person to experience great stress and believe that the person's life was in danger. Dr. Angelillo said that he thought the appellant had a realistic fear of the victim and that "as long as he's motivated to do so, I don't see anything that stands in the way [of

the appellant's rehabilitation]."

On cross-examination, Dr. Angelillo acknowledged that although the appellant fought in high school, he thought the appellant was a passive person. He also acknowledged that the appellant had prior convictions for reckless endangerment and harassment. He said that he did not know the facts that resulted in the reckless endangerment conviction but that the harassment conviction "had to do with . . . a girlfriend." He acknowledged that according to Lori Word, the appellant's "continually picking" on the victim led to the confrontation at the store two days before the shooting. However, he said, "That's not the way I understood it." Dr. Angelillo acknowledged that the appellant claimed he was under the influence of marijuana and cocaine when he killed the victim and said that drug use could cause a person to express anger more overtly. He said that the syndrome from which the appellant suffered was major depression with psychotic features.

On redirect examination, Dr. Angelillo testified that the appellant believed the victim was going to kill him. On recross examination, Dr. Angelillo testified that that was an unreasonable perception for a normal person.

The State introduced the appellant's presentence report into evidence. According to the report, the then thirty-three-year-old appellant failed to return a questionnaire for the report. Therefore, the report did not provide any information about the appellant's education, family, employment history, military history, or financial history. Regarding the appellant's health, the report states that while the appellant was being held in jail and awaiting court appearances for this case, he "stockpiled" his medication, attempted an overdose, made threats against his life, refused to cooperate with mental health counselors, and disrupted the jail facility. Later, the appellant tried to hang himself and refused to speak with mental health personnel. The report shows that the appellant has prior misdemeanor convictions for driving on a suspended license, reckless endangerment, and harassment.

In announcing the appellant's sentence, the trial court noted that this case was "clearly tragic on several levels to a great, great number of people" and that the appellant "may well have been convicted of murder in the first degree had this gone to trial." The trial court also noted that the State and the appellant had argued the applicability of numerous enhancement and mitigating factors. The court first addressed the enhancement factors. The court applied enhancement factors (1), that the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," but gave it very little weight; (3), that the offense involved more than one victim; and (10), that the appellant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(1), (3), (10). In addition, the trial court stated,

-5-

I do think the fact that he shot the victim in the head seven times in front of witnesses, some of them his family, should be considered as an enhancing factor. I'm not sure whether it's a statutory aggravating factor or not, but it's certainly a cruel thing to have done and should be considered by the Court in determining what the sentence is.

Regarding mitigating factors, the trial court found that the appellant, "although guilty of a crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Tenn. Code Ann. § 40-35-113(11). As for rehabilitation, the trial court stated, "I don't have any doubt that whatever rehabilitation will take place in his life will happen just as likely with a short sentence as a long sentence." The trial court concluded that the enhancement factors "outweigh the mitigating factors to the point that maximum sentences are, in fact, appropriate in this case." Thus, the trial court sentenced the appellant to twenty-five years for the second degree murder conviction, a Class A felony, and six years for each aggravated assault conviction, a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(1), (3). The trial court ordered that the sentences run concurrently.

## II. Analysis

The appellant contends that the trial court misapplied the two enhancement factors and that the trial court should have applied certain mitigating factors. The State argues that the appellant's sentence is not excessive. We agree with the State.

In conducting its sentencing review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Bise, 380 S.W.3d 682, 697-98 (Tenn. 2012). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, in State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012), our supreme court announced

that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; Bise, 380 S.W.3d at 698 n.32. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the

Sentencing Act." Id. at 346.

Turning to the instant case, we initially note that the appellant failed to include the guilty plea hearing, in which the State would have presented the factual basis for the pleas, in the appellate record. Our supreme court has held that when a record does not include a transcript of the guilty plea hearing, this court should determine "on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in Bise." State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012). Therefore, we must determine whether the record provides sufficient information to allow meaningful appellate review.

We also note that in addition to omitting the guilty plea hearing transcript, the appellate record does not include two exhibits that the appellant introduced into evidence at the sentencing hearing: the victim's Tennessee Department of Correction records and Dr. Angelillo's curriculum vitae. However, the trial court did not address either of the exhibits in announcing the appellant's sentence. Therefore, we conclude that the documents in the technical record, which includes the presentence report containing Dr. Angelillo's psychological evaluation of the appellant, and the testimony at the sentencing hearing provide sufficient information for appellate review. As a result, we may presume that the missing plea hearing transcript would support the ruling of the trial court. See id. at 279.

Turning to the appellant's argument that his sentences are excessive, the appellant contends that the trial court misapplied enhancement factor (3), that the offense involved more than one victim, because no evidence was presented that there were more victims than those that resulted in his pleas. The trial court applied factor (3) on the basis that "[t]here were more victims than he was actually charged with harming if you consider the situation." However, our supreme court has defined "victim," as used in Tennessee Code Annotated section 40-35-114(3), "as being limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." State v. Reid, 91 S.W.3d 247, 310 (Tenn. 2002). Moreover, the court has stated that enhancement factor (3) does not apply when there are separate convictions for each victim. Id. at 311. In this case, the appellant was convicted of the murder of Darnell Gentry and the aggravated assaults of Lori Word and another woman. Although other individuals were present on the porch at the time of the shooting, there were no additional "victims." Therefore, we agree with the appellant that the trial court misapplied enhancement factor (3).

The appellant also contends that the trial court misapplied enhancement factor (10), that the appellant had no hesitation about committing a crime when the risk to human life was high. In applying that factor, the trial court stated that "the loss of life was certain." Factor (10) is inherent in every homicide or attempted homicide in relation to the named victim; however, "the trial court may consider this factor when the defendant endangers the

lives of people other than the victim." State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000). Furthermore, "evidence of high risk to human life obviously is not required to establish aggravated assault causing serious bodily injury." State v. Jones, 883 S.W.2d 597, 602 (Tenn. 1994). The evidence shows that the appellant walked onto the porch, where he was in close proximity to the aggravated assault victims and others, and that he fired his weapon nine times. Therefore, we conclude that the trial court properly applied enhancement factor (10).

Next, the appellant contends that the trial court erred by enhancing his sentences based upon its finding that "he shot the victim in the head seven times in front of witnesses, some of them his family." In making that pronouncement, the trial court stated, "I'm not sure whether it's a statutory aggravating factor or not, but it's certainly a cruel thing to have done." Tennessee Code Annotated section 40-35-114 does not include such an enhancement factor or a catchall enhancement factor. Therefore, the trial court should not have addressed this consideration as an enhancement factor. Nevertheless, the trial court properly took into account the evidence of the crimes in its consideration of the principles of sentencing.

Finally, the appellant contends that the trial court erred by refusing to apply the following mitigating factors to his sentences: (2), that he acted under strong provocation; (3), that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense"; and (8), that he "was suffering from a mental or physical condition that significantly reduced [his] culpability for the offense." Tenn. Code Ann. § 40-35-113(2), (3), (8). However, the evidence established that the appellant walked onto the porch; apologized for his actions; calmly shot the unarmed victim, who had been eating an evening meal with friends, repeatedly in the head; and walked away from the scene. We fail to see how those facts support the application of any of the proposed mitigating factors.

In sum, we conclude that the trial court properly sentenced the appellant to twenty-five years for the murder conviction and six years for the aggravated assault convictions. Although the trial court misapplied enhancement factors, the trial court properly applied enhancement factors (1) and (10) and considered the additional principles of sentencing. We note that the trial court's comments during the hearing demonstrate that it was greatly troubled by the facts of this case, stating at one point that "I don't know whether this was an act of revenge or not, but it certainly was a classic example of the most egregious form of taking justice into a person's own hands and we can't have a civilization if we allow that to happen." Therefore, we affirm the appellant's sentences.

## III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE